IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

                Plaintiff,

vs.                          Case No. 09-40062-01/02-SAC

DAVID HERNANDEZ PEREZ
            and
JOEL FLORES-PACHECO,

                Defendants.


MEMORANDUM AND ORDER

This case comes before the court on motions by both defendants to suppress evidence. The government opposes the motions. An evidentiary hearing was held on September 15, 2009, after which the court permitted the parties to further brief the issues. The court has reviewed the supplemental briefs and is ready to rule.

Defendants were stopped while driving on I-70 for following another vehicle too closely. Trooper Nicholas, upon his initial approach to the vehicle, told defendants that he saw them following "right behind" another car but was "not going to write them a ticket." Defendants contend that the purpose of the stop, *i.e.*, to only give a verbal warning, was completed at the beginning of the stop when the trooper spoke the words stated above, thus their detention thereafter was illegal and their subsequent consent to search the vehicle was the fruit of that illegal detention. No challenge is made to the legality of the initial stop or to the fact that defendant Perez voiced consent to the search. By supplemental briefs, defendants additionally contend that no consensual

encounter followed the traffic stop and that no reasonable suspicion justified the non-consensual search of the truck. The government contends that the defendants lack standing, that the detention was reasonable, that the search was justified by consent given during a consensual encounter or, alternatively, by reasonable suspicion, and that a good faith exception to the exclusionary rule applies.

**Facts**

On June 5, 2009, at approximately 7:30 a.m., Trooper Chris Nicholas of the Kansas Highway patrol was patrolling Interstate 70 in Wabaunsee County, Kansas. As he turned through the median, he saw a pick-up following a car with approximately one second of separation between the two vehicles. The trooper caught up to the pick-up and stopped it for following too closely. *See* K.S.A. § 8-1523(a). Defendant Perez was driving the pick-up and defendant Flores-Pacheco was its only passenger.

Trooper Nicholas looked in the open truck bed as he approached it, and noticed it contained a hard hat, an air compressor and a circular saw.[1] The trooper spoke with the occupants of the vehicle through the passenger window, stating:

> Hi, there. How are you guys? All right. When I was turning through the median there, I don't know if that car saw me cut in on you, but you were right behind them. I'm not going to write you a ticket. You have your license with you real quick?

He then asked about their destination and purpose of travel. Defendant Perez said that they were going to do construction work on a house in Kansas City. Trooper Nicholas testified that when he asked the driver for his license, the driver initially handed him a pawn shop receipt for an air compressor purchased two days earlier, then handed him

---

[1]Trooper Nicholas later noticed additional construction tools in the truck bed.

his license. The trooper found it odd that the driver handed him a receipt instead of his driver's license or registration. The trooper testified to his belief that the driver seemed very nervous, was overly friendly and overly talkative, and had shaking hands.

Defendant Perez informed Trooper Nicholas that the passenger did not speak English, so other than asking the passenger for his license and where he lived, Trooper Nicholas communicated with defendant Perez. Trooper Nicholas testified that throughout the entirety of his encounter with the defendants, his tone of voice was conversational and he did not raise his voice.

The trooper then asked about ownership of the pick-up, and defendant Perez answered that it belonged to his boss. The trooper asked if the driver worked for the pick-up's owner, and he answered yes. The driver produced an Oregon Driver's License identifying him as David Hernandez Perez, and the passenger produced a Mexico Driver's License identifying him as Zeron Herrera.

 The trooper returned to his patrol vehicle to check the pick-up's license tag and the two men's identification. While waiting on responses from dispatch, the trooper had defendant Perez sit in his patrol vehicle and asked him more questions. The trooper learned that defendant Perez intended to call his boss when he got to Kansas City to find out where to go, that he had known the passenger for a couple of months, and that he had worked for the owner for about three months. The trooper asked what kind of construction work the men were going to do, and defendant Perez said, "anything." The trooper then asked what kind of work they were going to do in Kansas City, and Defendant Perez answered "fix a house." The trooper then asked if Defendant Perez meant remodel, and Defendant Perez indicated yes. The trooper asked how long they

3

planned to be in Kansas City, and Defendant Perez responded two or three weeks. The trooper asked how long the men had been doing this kind of work, and Defendant Perez answered that he had worked for his current boss, the pick-up's owner, about three months, before which he had driven a water truck in Las Vegas.[2] Defendant Perez told the trooper that Ramon Lopez was the person who had sent the men to Kansas City, and that he worked with him and not for him. Defendant Perez could not say how long the passenger had been doing construction work. Defendant Perez confirmed that the passenger did not speak English. After spending approximately three minutes in the trooper's vehicle, defendant Perez returned to the pick-up.

Trooper Nicholas then sat in his patrol car for approximately two more minutes waiting on responses from dispatch. During that time, he examined the receipt for air compressor defendant Perez had given him and noted that the name on the receipt, Ramon Lopez of Las Vegas, Nevada, was different from the names of the driver, the passenger, and the men's purported boss and owner of the pick-up. Approximately seven and one half minutes after the pick-up stopped, dispatch notified Trooper Nicholas that defendant Perez's driver license was suspended, and to whom the pick-up was registered. The pick-up was not reported as stolen but was not registered to either defendant or to Ramon Lopez. The trooper then returned to the passenger side window of the pick-up and asked who they worked for and who Ramon Lopez was.[3]

---

[2]Other conversation occurred but its meaning is unclear. For example, the trooper asks repeatedly about "this guy" but the video tape and testimony fail to clarify the person to whom he alludes.

[3]In the video, the trooper mentions the name of Miguel Gomez-Sandibal, but the facts do not reveal whether he is "this guy," or is the registered owner of the truck, or is

4

Trooper Nicholas then returned the men's identification and paperwork, notified defendant Perez that his driver's license was shown as suspended, and informed them that the passenger would have to drive. Approximately nine minutes after the pick-up had come to a stop, as Trooper Nicholas stated, "All right, Have a safe trip," defendant Perez interrupted by asking if the passenger would need to drive, and the trooper confirmed this to be true. Trooper Nicholas then took a few steps away from the window before turning, walking back to the window, and asking if he could ask the men a couple of more questions. Defendant Perez, who had opened his door and started to get out of the truck, answered yes, then shut his door. Trooper Nicholas testified that had defendant Perez attempted to drive away at that point, he would have stopped him for driving with a suspended license.

The trooper then asked defendant Perez how he was going to know what to do to the house in Kansas City when he got there, and he replied that the house was almost coming down. The trooper felt that defendant Perez's answers were not making sense and that he still appeared to be nervous. The trooper also found the following factors to be suspicious: 1) Defendant Perez seemed more nervous than was normal for a routine traffic stop; 2) the construction story did not make sense and Defendant Perez displayed little knowledge of the business; 3) the tools in the bed of the pick-up did not appear to be appropriate or sufficient to do the kind of job the defendants indicated they were to do and the tools were exposed to the elements in a way inconsistent with what a person who used them to make a living would allow; 4) the air compressor had been

the men's boss, or has any relation to these events.

5

purchased right before the trip but its purchase receipt listed a different name than the men's purported boss, whom Defendant Perez said was the person who owned the truck and sent the men to Kansas City; and 5) the men avoided giving straight answers about where they were going and what work they were going to do when they got there; 6) the defendant provided an air compressor receipt instead of a driver's license; and 7) the ownership of the truck was not to any of these parties.

Trooper Nicholas decided to ask for consent to search the pick-up. He first asked Defendant Perez if there was anything illegal in the pick-up, listing examples. Defendant Perez indicated there was not. The trooper then asked Defendant Perez if he could search the pick-up, and Defendant Perez said that he could. The trooper then checked the men for weapons, for his safety, and had them step in front of the vehicle while he searched with assistance from a back-up officer.

During the search, Trooper Nicholas observed that the tank attached to the air compressor appeared to have had the end cut away, split, re-welded, and painted over. The trooper used a density meter to examine the tank and found it to be more dense on one end, then removed a fitting from the tank and could see what looked like packaging inside. The defendants were taken into custody, were handcuffed, and were transported to the Wabaunsee County jail. The pick-up was driven to Topeka where examination of the air tank revealed approximately 1,316.5 grams of a mixture or substance containing approximately 1,280 grams of actual methamphetamine. Subsequent investigation determined that the fingerprints of the passenger, whose Mexican driver's license identified him as Zeron Herrera Gomez, were linked to the name Joel Flores-Pacheco. Defendants are currently charged by Information with one count of possession with

6

intent to distribute of 50 grams of more of a mixture or substance containing a detectable amount of meth in violation of 18 U.S.C. § 841(a)(1). These suppression motions followed.

**Standing**

The government asserts that the defendants lack standing to raise a Fourth Amendment challenge. "Fourth Amendment rights are personal and cannot be claimed vicariously." *United States v. Valdez Hocker*, 333 F.3d 1206, 1208 (10th Cir. 2003). "The proponent of a motion to suppress has the burden of adducing facts at the suppression hearing indicating that his own rights were violated by the challenged search." *United States v. Allen*, 235 F.3d 482, 489 (10th Cir. 2000) (quotations omitted), *cert. denied*, 532 U.S. 989 (2001).

> Whether a defendant's own Fourth Amendment rights were violated by a challenged search turns on the classic Fourth Amendment test: whether the defendant manifested a subjective expectation of privacy in the area searched and whether society is prepared to recognize that expectation as objectively reasonable. This court has held that, in order for a defendant to show such an expectation of privacy in an automobile, the defendant bears the burden at the suppression hearing to show a legitimate interest in or [a] lawful control over the car.

*Id.* (quotations and citations omitted).

Here, it is uncontested that neither defendant owned or leased the vehicle. Instead, defendants assert only that the vehicle belonged to their boss. The facts do not reveal the name of the registered owner of the pick-up driven by defendant Perez, or the name of the defendants' boss who defendants assert owned and loaned the pick-

7

up.[4]

> " Where, as here, "the proponent of a motion to suppress is ... not the registered owner ... the proponent bears the burden of establishing 'that he gained possession from the owner or someone with authority to grant possession.' " *Id.* (quoting *United States v. Arango*, 912 F.2d 441, 445 (10th Cir.1990)). We consider: "(1) whether the defendant asserted ownership over the items seized from the vehicle; (2) whether the defendant testified to his expectation of privacy at the suppression hearing; and (3) whether the defendant presented any testimony at the suppression hearing that he had a legitimate possessory interest in the vehicle." *Allen*, 235 F.3d at 489.

*United States v. Eckhart*, 569 F.3d. 1263, 1274-75 (10th Cir. 2009). Here, defendants did not testify at the suppression hearing and do not assert ownership over any items seized from the vehicle.

Nonetheless, the court believes that under the circumstances, and viewing the facts in the light most favorable to the defendants, defendants have met their burden, although scantily, to establish standing. Defendant Perez stated that he gained possession of the pick-up from his boss who owned the vehicle. Dispatch apparently confirmed that the registration given to the Trooper by defendant Perez was in fact for the pick-up he was driving, and that the person named by defendant Perez as his boss was in fact the registered owner of the pick-up. "The proponent of a motion to suppress need not always come forward with legal documentation establishing" lawful possession of the area searched, [but] "the proponent must at least state that he gained possession from the owner or someone with the authority to grant possession." *United States v. Martinez*,  983 F.2d 968, 973 (10th Cir. 1992), citing *United States v. Miller*, 821 F.2d

---

[4]It appears that Trooper Nicholas learned the name of defendants' boss and the name of the registered owner of the pick-up, but his testimony was carefully crafted to avoid any mention of it. On the video, he vaguely refers only to "this guy" or alludes to names on unidentified documents, making the record on this issue ambiguous, at best.

546, 548 & n. 2 (11th Cir.1987)), *cert. denied*, 507 U.S. 1056 (1993). Defendant Perez

has sufficiently done so.

### Scope of the stop

Defendants first contend that the scope of the stop exceeded its stated purpose

and was thus unreasonable. The law applicable in testing the legality of a detention

during a traffic stop is well established.

> Standards that the Supreme Court established in *Terry v. Ohio*, 392 U.S.
> 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), govern the application of the Fourth
> Amendment to traffic stops and resulting detentions. In *Terry*, the court
> recognized that there is no "ready test" to determine the reasonableness of a
> seizure other than "balancing the need to ... seize against the invasion which the
> ... seizure entails." *Id.* at 21, 88 S.Ct. 1868. Thus, courts must determine
> "whether the stop and detention, considered in light of the totality of the
> circumstances, were reasonable." *Edgerton*, 438 F.3d at 1047.

*United States v. Orduna-Martinez*, 561 F.3d 1134, 1137 (10th Cir. 2009). *Terry* instructs

this court to first consider "whether the officer's action was justified at [the stop's]

inception," and then whether the officer's subsequent conduct "was reasonably related

in scope to the circumstances that justified the interference in the first place." *Amundsen

v. Jones*, 533 F.3d 1192, 1198 (10th Cir. 2008) quoting *United States v. Tibbetts*, 396

F.3d 1132, 1136 (10th Cir. 2005).

Defendants do not challenge the initial stop. *See* KSA § 8-1523(a) (prohibiting

following another vehicle more closely than is reasonable and prudent under the

circumstances). The court nonetheless finds, based upon Trooper Nicholas's testimony,

that the initial stop was justified by a reasonable suspicion that the vehicle driven by

Defendant Perez was following another vehicle too closely, in violation of Kansas law.

Defendants contend that the scope of the traffic stop exceeded its stated

9

purpose. "[A]n investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop." *Florida v. Royer*, 460 U.S. 491, 500(1983). *See Amundsen*, 533 F.3d at 1199. The content of police questions during a lawful detention does not implicate the Fourth Amendment as long as those questions do not prolong the detention. *Muehler v. Mena*, 544 U.S. 93, 101 (2005); *United States v. Stewart*, 473 F.3d 1265, 1269 (10th Cir. 2007). It is the government's burden to demonstrate that the seizure it seeks to justify on the basis of a reasonable suspicion was sufficiently limited in duration to satisfy the conditions of an investigative seizure. *United States v. Fisher*, 99 Fed.Appx. 190, 195, 2004 WL 1098911, 4 (10th Cir. 2004). "A seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission," *Illinois v. Caballes*, 543 U.S. 405, 407 (2005), but the cases "impose no rigid time limitation on *Terry* stops," *United States v. Sharpe*, 470 U.S. 675, 685 (1985). Because the defendants contend their seizure took longer than necessary for its stated purpose, the court examines the purpose of the initial stop, despite the fact that defendants do not challenge its legality.

Defendants contend that Trooper Nicholas's words reveal that his sole purpose in stopping the vehicle was to issue a verbal warning to the defendant, and that the verbal warning was complete before he request a driver's license or performed any other indicia of a routine traffic stop. The court disagrees, finding it unreasonable to construe the trooper's statement, "I'm not going to write you a ticket. You have your license there?" to mean "I'm only going to give you this verbal warning. You're free to go now." Just as Kansas courts favor reasonable over unreasonable interpretations of a

10

contract, *Jones v. KP&H LLC,* 288 Fed.Appx. 464, 468, 2008 WL 2805444, 3 (10th Cir. 2008), this court favors reasonable rather than unreasonable constructions of this statement by Trooper Nicholas.

Further, the language targeted by the defendants is ambiguous. The words "I'm not going to write you a ticket," could reasonably be interpreted to mean, among other options: 1) the Trooper was not going to issue a ticket requiring payment of a fine but fully intended to write a warning ticket; or 2) the Trooper was not going to issue any kind of written warning or citation whatsoever. Here, as in contract interpretation, "when interpreting an ambiguous term, context matters." *Wilson v. Workman*, 577 F.3d 1284 (10th Cir. Aug. 27, 2009). The court views Trooper Nicholas's question, "You have your license there?" which immediately followed the statement, "I'm not going to write you a ticket," as illuminating his subjective intent and purpose to initiate the same procedures which are standard for routine traffic stops, rather than as squarely contradicting them. This interpretation is confirmed by the trooper's testimony which established that he wrote a written warning in this case for his own records, as he initially intended, but had no intention of issuing a ticket to defendants.

Defendants' focus on subjective intent, however, is seriously misplaced. Even assuming that Trooper Nicholas initially intended to give only a verbal warning and that this court could determine that intent, a trooper's subjective intent does not affect the reasonableness of a stop. *Whren v. United States*, 517 U.S. 806, 813 (1996).

> We have long since rejected the notion that an officer's subjective motivations in effecting a stop are relevant to the *Terry* analysis. *See, e.g., United States v. Chavez*, 534 F.3d 1338, 1344 (10th Cir.2008); *Botero-Ospina*, 71 F.3d at 787. Instead, we consider the reasonableness of an officer's actions using an "objective standard" that takes the "totality of the circumstances" and

the "information available" to the officer into account. *United States v. Sanchez*, 519 F.3d 1208, 1213 (10th Cir.2008). Under this standard, an officer's "actual motivations or subjective beliefs and intentions" are, quite simply, irrelevant. *United States v. DeGasso*, 369 F.3d 1139, 1143 (10th Cir.2004). We ask, instead, whether "the facts available" to the detaining officer, at the time, warranted an officer of "reasonable caution" in believing "the action taken was appropriate." *Terry*, 392 U.S. at 21-22, 88 S.Ct. 1868; *see also Banks v. United States*, 490 F.3d 1178, 1183 (10th Cir.2007) (recognizing that the "ultimate touchstone of the Fourth Amendment is reasonableness").

*United States v. Winder*, 557 F.3d 1129, 1135 (10th Cir.), *cert. denied*, 129 S.Ct. 2881, 174 L.Ed.2d 591, 77 USLW 3709 (2009).

(U.S. Jun 29, 2009) . Thus when an officer observes a traffic violation, whether he subjectively intends to do more than write a ticket, such as to search the vehicle for drugs, or intends to do less than write a ticket, such as to issue only a verbal warning, the officer's subjective motivation in stopping the vehicle is constitutionally irrelevant. *United States v. Gregoire*, 425 F.3d 872, 878 (10th Cir. 2005). Supreme Court cases "foreclose any argument that the constitutional reasonableness of traffic stops depends on the actual motivations of the individual officers involved." *Whren*, 517 U.S., at 813.

The record establishes that the purpose of the initial stop was to conduct a routine traffic stop based on the trooper's reasonable suspicion that the defendant was driving too closely. The record does not demonstrate that the underlying reasonable suspicion of that traffic violation dissipated prior to Trooper Nicholas's request for and review of defendant's documents and his request for and receipt of information from dispatch relevant to the driver and the vehicle. *See Amundsen*, 533 F.3d at 1201. It is immaterial that the defendant was not following too closely at the instant his vehicle was pulled over. Although a trooper cannot detain a person or perform the tasks incident to an ordinary traffic stop after a trooper observes that no traffic violation has occurred,

12

*see United States v. Edgerton,* 438 F.3d 1043 (10th Cir. 2006); *United States v.*

*McSwain*, 29 F.3d 558, 561-62 (10th Cir.1994), such was not the case here. The facts

available to Trooper Nicholas at the time of the initial stop warranted an officer of

reasonable caution in believing that a traffic violation had occurred. Because Trooper

Nicholas saw defendant's vehicle follow another vehicle too closely, he was legally

justified in requesting a driver's license and vehicle registration, running a computer

check, and determining whether to issue a citation or to merely give a verbal warning.

Where, as here, the initial traffic stop is valid, a detention for the time necessary

for the officer to request a driver's license and vehicle registration and run a computer

check is generally reasonable in duration.

> [I]n a routine traffic stop an officer may request a license and registration,
> run checks through dispatch, issue a citation, and ask questions that do not
> lengthen the detention; under our settled precedent, this is true even when the
> trooper stops the vehicle merely to issue a warning citation. *See, e.g., Patterson*,
> 472 F.3d at 772-73, 776; *Alcaraz-Arellano*, 441 F.3d at 1256-57, 1259; *Wallace*,
> 429 F.3d at 971-72, 974.

*United States v. Montes*, 280 Fed.Appx 784 (10th Cir. 2008). The court finds the same

is true even when an officer stops the vehicle merely to issue a verbal warning for a

reasonably suspected, non-dispelled traffic offense. The video of the stop shows that

Trooper Nicholas's inquiries during the detention did not measurably extend the duration

of the traffic stop. The court finds that the approximate nine-minute detention of the

defendants during the traffic stop was reasonable in duration for its purpose.

### Consensual encounter

A traffic "stop generally ends when the officer returns the driver's license,

registration, and insurance information." *United States v. Manjarrez*, 348 F.3d 881, 885

13

(10th Cir. 2003), *cert. denied*, 541 U.S. 911 (2004). *See Brendlin v. California*, 551 U.S. 249, 258 (2007).

> A routine traffic stop becomes a consensual encounter once the trooper has returned the driver's documentation so long as " 'a reasonable person under the circumstances would believe he was free to leave or disregard the officer's request for information.' " (Citations omitted).

*United States v. Bradford*, 423 F.3d 1149, 1158 (10th Cir. 2005).

The government contends that the traffic stop ended and became a consensual encounter when the trooper returned defendant's documents, told defendants, "All right, Have a safe trip," walked away from the window, then returned to ask for and receive permission to ask more questions. Defendants contend that because the trooper's conversation prevented the suspended driver from switching places with the passenger, as was required before the trooper would permit them to drive away, defendants were not free to leave and no consensual encounter was established.

"A consensual encounter is simply the voluntary cooperation of a private citizen in response to non-coercive questioning by a law enforcement official." *United States v. Patten*, 183 F.3d 1190, 1194 (10th Cir.1999) (quotation omitted). The Tenth Circuit follows the "bright-line" rule that the return of a driver's documents is necessary, but not sufficient, for an encounter initiated by a traffic stop to be deemed consensual. *See United States v. Guerrero-Espinoza*, 462 F.3d 1302 (10th Cir. 2006). "The issue is whether law enforcement conduct as perceived by a reasonable person would communicate that the person was not free to decline law enforcement requests or end the encounter." *Id*, quoting *Gregoire*, 425 F.3d at 879. "As long as a reasonable innocent person, as opposed to a person knowingly carrying contraband, would feel free

14

to leave [or otherwise terminate the encounter], such encounters are consensual...." *United States v. Rodriguez-Lopez*, 222 Fed.Appx. 784 (10th Cir.), quoting *United States v. Laboy*, 979 F.2d 795, 798 (10th Cir.1992), *cert. denied*, 128 S.Ct. 222, 169 L.Ed.2d 176 (2007).

The Tenth Circuit has identified several factors to assist in the determination of whether a police-citizen encounter is consensual:

> the threatening presence of several officers; a display of a weapon by an officer; some physical touching by an officer; use of language or tone of voice indicating that compliance with [the] officer was compulsory; prolonged retention of a person's personal effects such as plane tickets, identification or luggage; a request to accompany the officer to the station; whether the encounter occurred in a nonpublic place; and whether the encounter took place in a small, enclosed space.

*Laboy*, 979 F.2d at 799. None of these factors is dispositive, nor are the factors exclusive. *Fuerschbach v. SW Airlines Co.*, 439 F.3d 1197, 1203 (10th Cir. 2006). "The focus of the test is on the coercive effect of police conduct, taken as a whole on a reasonable person." *United States v. Spence*, 397 F.3d, 1280, 1283 (10th Cir. 2005).

Here, although Trooper Nicholas's termination of the traffic stop could have been stated more emphatically, no indicia of coercion are present. The traffic stop became a consensual encounter when Trooper Nicholas returned the license and other documents, stated "All right, Have a safe trip," stepped away from the pick-up, and asked questions without further constraining the driver by an overbearing show of authority. Trooper Nicholas's conduct would have conveyed to a reasonable person that he was free to decline his requests or otherwise terminate the encounter, although a practical impediment existed to defendants' driving off at that very instant. That the defendants needed to switch places before driving away, without more, does not make

15

the consent involuntary. *See Bradford*, 423 F.3d 1149; *United States v. Gigley*, 213 F.3d 509, 514 (10th Cir.2000); *United States v. Anderson*, 114 F.3d 1059, 1064 (10th Cir.1997) (finding encounters to be consensual, despite the fact that the defendant was still in the patrol car with the officer at the time). Additionally, it is irrelevant that Trooper Nicholas would not actually have allowed the defendant to leave, as long as the defendant consented while he had an objectively reasonable belief that he was free to leave. *See United States v. Manzano*, 135 Fed.Appx. 193, 197, 2005 WL 1415571, 3 (10th Cir. 2005); *United States v. Garcia-Rodriguez*, 127 Fed.Appx. 440, 446, 2005 WL 752728, 4 (10th Cir.), *cert. denied*, 546 U.S. 855 (2005). Here, no evidence suggests a coercive display of authority or shows that defendants' subsequent consent to search the vehicle was the fruit of an illegal detention.

The court finds it unnecessary to address the alternative grounds raised by the government, including Trooper Nicholas's reasonable suspicion after the traffic stop ended, and a good faith exception to the exclusionary rule.

IT IS THEREFORE ORDERED that Defendant Hernandez Perez's motion to suppress (Dk. 26), and Defendant Flores-Pacheco's motion to suppress (Dk. 27) are both denied.

Dated this 30th day of September, 2009.

s/ Sam A. Crow
Sam A. Crow, U.S. District Senior Judge